UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**LINDA JACKSON o/b/o**
**D.N.**

                      **Plaintiff,**

-vs-                                                                Case No. 6:03-cv-1615-ORL-KRS

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

                      **Defendant.**

_____

## ORDER

**TO THE UNITED STATES DISTRICT COURT**

This matter came before the Court for consideration without oral argument on the complaint filed by Linda Jackson on behalf of her nephew, Deedrick, seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim for social security disability benefits for Deedrick. Doc. No. 1.[1] The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"). Doc. No. 20.[2] This matter has been referred to me for disposition pursuant to the consent of the parties. Doc. No. 6.

---

[1] Jackson has custody of Deedrick pursuant to Court order. TR. 97.

[2] The Court granted a remand pursuant to sentence six of 42 U.S.C. § 405(g) in March 2004. Doc. No. 9. The SSA completed the proceedings on remand, and the case was reopened in June 2004. Doc. No. 10.

**I. PROCEDURAL HISTORY**

In March 2001, Jackson applied for disability benefits for Deedrick under the children's disability provisions of the Supplemental Security for the Aged, Blind and Disabled program ("SSI"), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the "Act"). Her application was denied initially and on reconsideration. Jackson requested a hearing before an Administrative Law Judge ("ALJ"). TR. 28.

An ALJ held a hearing at which Jackson testified. TR. 40. Jackson was represented at the hearing by a non-attorney representative. *Id.*

After considering the testimony and the medical records presented, the ALJ determined that Deedrick had never engaged in substantial gainful activity. TR. 15. He found that Deedrick had attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder, which were severe impairments. TR. 16. The ALJ determined that Deedrick's condition did not meet listed impairment 112.11 because his ADHD "is not manifested by developmentally inappropriate degrees of inattention, impulsiveness and hyperactivity and he does not have marked impairment in age appropriate cognitive communicative function, social functioning or personal functioning documented by history and medical findings." TR. 16.

Reviewing the factors necessary to determine whether Deedrick's impairments were functionally equivalent to a listed impairment, the ALJ found that Deedrick had no limitation in the domain of acquiring and using information. TR. 18. He found that Deedrick had a marked limitation in the domain of attending and completing tasks. TR. 18. He found the Deedrick had less than marked limitations in the domains of interacting and relating with others, moving about and manipulating objections, caring for himself,

and health and physical well-being. TR. 18-19. Because the ALJ concluded that Deedrick did not have functional limitations equivalent to a listed impairment, he determined that Deedrick was not disabled. TR. 20.

Jackson timely requested review of the ALJ's decision. TR. 8. The Appeals Council found no basis for changing the ALJ's decision. TR. 3-4. Jackson timely filed her complaint in this Court. Doc. No. 1.

## II.    JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Jackson's application for SSI benefits for Deedrick. Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

Deedrick was born June 22, 1994. Jackson claimed that Deedrick had been disabled since his birth. TR. 95.

Deedrick lived with his mother and his great-aunt, Joyce Brown, until he was five years old. Thereafter, he was placed with Jackson. TR. 59.

The record before the Court is scant. Jackson testified that Deedrick attended regular classes at school. He was required to repeat the second grade. He had behavioral problems at school and failed to complete and turn in his homework assignments. TR. 33. He had good days and bad days at school, with the good days occurring seven to eight days a month. TR. 34, 38. During the bad days, he would not do his work and distracted the class. TR. 34. Once or twice a week he urinated on himself at school. TR. 34.

Deedrick also became easily upset when at home. Jackson described one instance in which Deedrick picked up an iron pipe and swung it at another child. TR. 35. Another time, Deedrick got mad at a child and punched him in the stomach and arms. TR. 36. On bad days at school, Deedrick picked fights with other children. TR. 38.

Deedrick was able to dress himself and care for his personal hygiene, although Jackson had to remind him to bathe and brush his teach. TR. 36. He could also feed himself. TR. 36.

Jackson described Deedrick as fidgety. TR. 37. Deedrick could watch television for twenty to thirty minutes. TR. 36. He would often put things in his mouth. TR. 37. He could not sit still for very long. TR. 37. He did not follow Jackson's instructions. TR. 37-38.

Deedrick took medication, which Jackson faithfully administered to him even though Deedrick complained that it caused headaches. TR. 35. Jackson did not believe the medication was controlling Deedrick's behavior, and she could discern no difference between the times Deedrick was medicated and when he was not medicated. TR. 37.

In August 1998, Raza Ali, M.D., wrote that Deedrick was having behavioral problems. TR. 42.

Deedrick was admitted to Open Door Social Services of Florida, Inc. ("Open Door") in October 1999. While at Open Door, Deedrick was placed in a foster home. TR. 46. His foster mother reported that Deedrick angered easily, did not listen or follow directions well, was very active, and wet the bed several times during the night. TR. 57. At that time, Deedrick was being treated with Dexadrine. TR. 57. Aftab Qadir, M.D., a child psychiatrist, observed that Deedrick was very active, anxious, and had a short attention span. His diagnosis was ADHD and Oppositional Defiant Disorder with a GAF

of 20, with a past GAF of 45.  Dr. Qadir recommended continued use of medication and additional testing.  TR. 58. While he stayed at the foster home, Deedrick received instruction in anger management and dealing with his impulsivity.  The treatment notes reflect that Deedrick made some improvement.  TR. 46-47.  Specifically, in January 2001, the treatment team reported that Deedrick had made improvement "as evidenced by a decrease in his outburst of anger and tantrums, a decrease in his bed wetting, [and] a decrease in his impulsive behavior," although he was then reporting "hearing voices, seeing shadows and having a difficult time falling asleep." TR. 49.

Dr. Qadir continued to treat Deedrick through at least October 2002.  TR. 51-58, 76-83.  Dr. Qadir consistently observed that Deedrick was active and difficult to redirect.  Deedrick also still had problems with bedwetting, and Dr. Qadir observed that he was still sucking his thumb.  He treated Deedrick with medication.  TR. 52, 55-56.

In May 2000, Jackson reported the Deedrick had good and bad days.  Jackson told Dr. Qadir that she believed that medication helped alleviate Deedrick's symptoms about 75% of the time.  However, Dr. Qadir noted that Deedrick was "quite active, moved around the room while sucking on his thumb, on and off the couch and was difficult to redirect." TR. 54. In June 2000, Jackson told Dr. Qadir that she had not seen significant improvement in Deedrick's behavior.  He was still active, sucking his thumb, difficult to redirect and had uncontrolled urination during the day and at night.  Dr. Qadir's observations of Deedrick were consistent with Jackson's report, except that Deedrick did not have an incident of uncontrolled urination while in the office.  Dr. Qadir continued treating Deedrick with medication.  TR. 53.  In August 2000, Jackson reported that Deedrick was doing fairly well with no major problems.  Dr. Qadir noted that Deedrick

was sucking on his thumb, slightly fidgety but redirectable.  TR. 51.  In a treatment note dated February 2002, Deedrick's aunt reported that Deedrick was being bad at school, acting as the class clown, with continued aggressiveness and crying spells.  TR. 79.

In July 2001, Cydney Yerushalmi, Ed.D., examined Deedrick at the request of the SSA.  Dr. Yerushalmi observed Deedrick sucking his thumb during the evaluation.  Deedrick's great-aunt, Joyce Brown, accompanied him to the evaluation.  Brown reported that Deedrick was independent in activities of daily living, that he enjoyed playing with his friends, riding a scooter and bicycle, and watching television.  Dr. Yerushalmi administered a battery of tests.  Deedrick was anxious to complete the testing, which may have resulted in less than optimal performance.  TR. 59-60.

The tests disclosed that Deedrick was in the low average range of intellectual functioning, but within the average range of academic functioning.  He demonstrated oppositional behaviors that had a negative effect on his performance.  TR. 62.  Dr. Yerushalmi's assessment was ADHD controlled by medication according to Brown.  Dr. Yerushalmi assessed Deedrick's GAF at 70.  TR. 63.

Professionals who reviewed Deedrick's records completed childhood disability evaluation forms.  In August 2001, K. Eeltink, Ph.D., opined that Deedrick had a marked limitation in the domain of attending and completing tasks, and less than marked limitations in the domains of acquiring and using information and interacting and relating with others.  TR. 64-69.  In January 2002, Ann J. Adams, Psy.D., reached the same conclusion with the addition of a less than marked limitation in the domains of caring for yourself and health and physical well-being.  TR. 70-75.

## IV.  STANDARD OF REVIEW.

To qualify for SSI benefits, a child must not be engaged in substantial gainful activity and must have severe impairments that meet, medically equal or functionally equal the Listing of Impairments contained in the social security regulations.  *See Gibbs v. Barnhart*, 130 Fed. App. 426, 428-29 (11th Cir. 2005).

> In determining whether a child's impairment functionally equals a listing, the regulations require consideration of six "domains," which are "broad areas of functioning intended to capture all of what a child can and cannot do." 20 C.F.R. 416.926a(b)(1).  These six domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for himself/herself; and health and physical well-being.  *Id.* § 416.926a(b)(1)(i)-(vi). To satisfy the "functional equivalent" standard, a child claimant must have "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(b)(1).  A "marked" limitation is defined as a limitation that "interferes seriously with [the] ability to independently initiate, sustain, or complete activities," and is "more than moderate." *Id.* § 416.926a(e)(2). An "extreme" limitation is reserved for the "worst limitations" and is defined as a limitation that "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities," but "does not necessarily mean a total lack or loss of ability to function."  *Id.* § 416.926a(e)(3).

*Id.* at 429.

## V.     ANALYSIS.

Jackson's presentation is poorly organized.  It appears that she intends to make the following arguments: Deedrick's condition meets listed impairment 112.11; the ALJ erred by failing to conclude that Deedrick had marked limitations in the domains of interacting and relating with others and caring for yourself; and the ALJ erred by failing to consider the functional limitations arising from depression and anxiety, which might be

significant enough to meet listed impairment 112.04. I will address only the first two issues because I find them to be dispositive.[3]

Listing 112.11 sets forth the standards to support a finding that ADHD is presumptively disabling. It states as follows:

> 112.11 *Attention Deficit Hyperactivity Disorder:* Manifested by developmentally inappropriate degree of inattention, impulsiveness, and hyperactivity.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A.   Medically documented findings of all three of the following:
>
> 1. Marked inattention; and
> 2. Marked impulsiveness; and
> 3. Marked hyperactivity;
>
> AND
> B.   For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.11 (2004). Although Jackson contends that Deedrick has been disabled since his birth, the evidence in the record begins in 1998, when Deedrick was four years old. Therefore, I evaluate the evidence at it relates to children age 3 to age 18.

---

[3] Jackson was advised in the scheduling order that "[a]ny issue not specifically raised . . . will be considered to have been waived unless the interests of justice require the Court to consider the issue." Doc. No. 13 at 2.

With respect to the part A criteria, the ALJ stated, "the claimant's attention deficit hyperactivity disorder is not manifested by developmentally inappropriate degrees of inattention, impulsiveness and hyperactivity."  TR.  16.  With respect to the part B criteria, the ALJ found that Deedrick did not "have marked impairment in age appropriate cognitive communicative function, social functioning or personal functioning documented by history and medical findings . . . ."  TR.  16.

The ALJ's summary conclusions makes it virtually impossible to determine whether he applied the correct law and relied upon facts supported by substantial evidence in the record.  Indeed, the conclusion regarding the part A criteria of the listing is particularly troubling in light of the ALJ's later determination that Deedrick had marked limitations in the domain of attending and completing tasks because "without current medications, he is off task, *hyperactive, impulsive, inattentive* and unable to complete assigned tasks independently."  TR. 18 (emphasis added).

The ALJ's analysis of Deedrick's functional limitations under part B of the listing is equally sparse.  The consideration of Deedrick's limitations in social functioning correlates with the domain of interacting and relating with others.  In this regard, the ALJ stated that Deedrick "is respectful and related well with peers, even before medical adjustment."  TR.  19.  I am unable to find substantial factual support for this conclusion in the ALJ's summary of the facts or in the record as a whole.  The ALJ concluded that Deedrick had oppositional/defiant disorder, which is "a recurrent pattern of negativistic, defiant, disobedient and hostile behavior toward authority figures . . . ."  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS §

313.81 (4th ed. 2000).  The finding that Deedrick had this impairment is inconsistent with the conclusion that Deedrick is respectful.  While Joyce Brown stated to Dr. Yerushalmi in 2001 that Deedrick enjoyed playing with his friends, it is not clear that Brown had then-current, personal knowledge of Deedrick's behaviors since Deedrick had not lived with her since he was five years old (approximately 1999).  In comparison, Jackson, with whom Deedrick was living at the time of the ALJ's hearing, reported that Deedrick angered easily and picked fights with other children.  These complaints were consistent with the reports she made to Dr. Qadir, as reflected in his treatment notes.

The ALJ's finding regarding social functioning correlates with the domain of caring for yourself.  This domain considers, among other things, whether the child takes care of his personal and emotional wants and needs in appropriate ways.  20 C.F.R. § 416.926a(k)(1).  In this domain, the ALJ was required to consider Deedrick's inability to get to the bathroom on time and his thumb sucking.  *See, e.g., Daniels v. Barnhart*, No. SA-04-CA-0261 XR (NN), 2005 WL 1403885 at *6 (W.D. Tex. June 14, 2005) (requiring ALJ to consider child's thumb sucking and defecation outdoors in determining the degree of limitation in the domain of "caring for yourself").  The ALJ's entire analysis of this domain is as follows:  "He has occasional hygiene problems when he does not get to the bathroom on time and wets himself."  TR.  19.  It is unclear what facts the ALJ relied upon to determine that Deedrick's uncontrolled urination occurred only occasionally.  TR. 19.  Further, while the ALJ referenced thumb sucking in the statement of the record, there is no analysis of its impact on this domain.

When, as here, the ALJ fails to explain the legal and factual basis supporting his conclusions, the Court is unable to conduct a meaningful review of the decision.  *See*

*Owens v. Heckler*, 748 F.2d 1511, 1514-15 (11th Cir. 1984) ("A clear articulation of both fact and law is essential to our ability to conduct a review that is both limited and meaningful."). Accordingly, remand is required to permit the Commissioner to articulate the legal and factual underpinning of her conclusion.

### IV.   CONCLUSION.

For the reasons stated above, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings. I direct the Clerk of Court to issue a judgment consistent with this Order and, thereafter, to close the file.

Done and Ordered in Orlando, Florida on July 28, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Parties